IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

WILLIE GEORGE MOORE,                    )
                                        )
                Plaintiff,              )
                                        )
        v.                              )      CV 317-002
                                        )
JORGE CASTRO, Ex-CERT Team              )
Officer,                                )
                                        )
                Defendant.              )

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

Plaintiff, an inmate at Telfair State Prison ("TSP") in Helena, Georgia, is proceeding *pro se* and *in forma pauperis* in this case brought pursuant to 42 U.S.C. § 1983.  For the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** Defendant Castro's motion for summary judgment be **GRANTED**, (doc. no. 71), a final judgment be entered in favor of Defendant, and this civil action be **CLOSED**.

## I.      PROCEDURAL BACKGROUND

On February 8, 2017, the Court screened Plaintiff's complaint and directed service of process on Defendants Phillip Hall, Jacob Beasley, and Jorge Castro based on Plaintiff's allegations of deliberate indifference to his safety.  (See doc. no. 7.)  On April 10, 2017, those three Defendants filed a pre-answer motion to dismiss.  (Doc. no. 18.)  Plaintiff

opposed the motion to dismiss and requested to amend his complaint, which the Court granted.  (Doc. nos. 21, 22, 26.)

Plaintiff filed his amended complaint, (doc. no. 30), which supersedes and replaces in its entirety the original pleading.  See Hoefling v. City of Miami, 811 F.3d 1271, 1277 (11th Cir. 2016).  Although Plaintiff originally named three Defendants, he voluntarily dismissed his claims against Warden Hall and CERT Sergeant Beasley.  (See doc. no. 30, pp. 10-11.)  The Court screened the amended complaint, dismissed Defendants Hall and Beasley, along with any official capacity claims for monetary damages against Defendant Castro, and allowed Plaintiff to proceed with his Eighth Amendment claim against Defendant Castro.  (Doc. nos. 31, 32, 37.)  Defendant Castro then withdrew his motion to dismiss the original complaint and moved to dismiss the amended complaint, which the Court denied.  (Doc. nos. 38, 39, 46, 48.)  In ruling on the second motion to dismiss, the Court explained any claims related to alleged activities prior to the attack were raised against the two Defendants whom Plaintiff voluntarily dismissed.  (Doc. no. 46, pp. 4-5.)  Thus, as specifically delineated by United States District Judge Dudley H. Bowen, Jr., the case was allowed to "proceed against Defendant [Castro] only as to the individual capacity claim for money damages based on the actions taken after Inmate Norwood attacked Plaintiff."  (Doc. no. 48.)

Defendant then timely filed his answer, and the Clerk of Court issued a Scheduling Notice setting deadlines for the case.  (Doc. nos. 49, 50.)  After several extensions of case deadlines, Defendant timely filed a motion for summary judgment.  (Doc. no 71.)  At that time, the Clerk issued a notice concerning the summary judgment motion and the summary judgment rules, the right to file affidavits or other materials in opposition, and the

consequences of failing to comply with the requirements for responding.  (See doc. no. 72.)
Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir.
1985) (per curiam), are satisfied.

As part of the extensive filings following Defendant's motion for summary judgment,
Plaintiff submitted a document titled, "The Plaintiff Oppose the Defendant Motion for
Summary Judgment Because Violation of the Federal Rule of Civil Procedure 11.  Alleging
New Defense in Bad Faith."  (Doc. no. 75.)  Therein, Plaintiff complains defense counsel's
theory of the case set forth in the summary judgment motion does not match the explanation
he received from prison officials who ruled on his grievance when the event at issue occurred
over two years ago.  (Id.)  Consistent with the title, the Clerk of Court docketed the filing as a
Response in Opposition to the summary judgment motion.  However, Defendant interpreted
the filing as motion for Rule 11 sanctions and filed his opposition to the perceived request.
(Doc. no. 81.)

However, the filing can in no way be interpreted as a viable motion for Rule 11
sanctions.  First, under Rule 11, a motion for sanctions must be made separately from any
other motion, and must not be filed or presented to the Court if the challenged filing is
withdrawn or appropriately corrected within twenty-one of service on the opposing party.
Fed. R. Civ. P. 11(c)(2).  Plaintiff did not follow the proper procedural requirements for
filing a Rule 11 motion when he made his filing with the Court without first serving it on
Defendant and waiting twenty-one days.

Second, and more importantly, Plaintiff has not shown anything in Defendant's summary judgment motion was filed in bad faith, or otherwise presented for an improper purpose as contemplated by Rule 11(b).  Rather, for purposes of summary judgment only, Defendant has adopted - but still disputes (doc. no. 71-4, p. 3 & n.1) - Plaintiff's version of events to argue he is entitled to summary judgment *even if* the Court were to accept Plaintiff's version of the facts.  To the extent Plaintiff argues defense counsel has taken a different approach to the case than that of Department of Corrections officials investigating the grievance, there is no evidence as to the standard by which such internal investigations are judged, let alone that the standard is the same as applies in a § 1983 case brought in federal court.  There is simply no basis for concluding the defense of a claim in federal court must mirror administrative proceedings regarding a prison grievance.

In sum, there was no properly filed motion for Rule 11 sanctions filed.  To the extent the document titled, "The Plaintiff Oppose the Defendant Motion for Summary Judgment Because Violation of the Federal Rule of Civil Procedure 11.  Alleging New Defense in Bad Faith," (doc. no. 75), might be liberally construed as a request for Rule 11 sanctions, the Court **REPORTS** and **RECOMMENDS** it be **DENIED**.  (Doc. no. 75.)

The Court turns to the summary judgment motion.

## II.   FACTS

The general outline of relevant events occurring on May 6, 2016, is undisputed.  While Plaintiff was working as an orderly in the F-2 dormitory at TSP, an inmate on the second floor flooded his cell, causing water to accumulate where Plaintiff working on the first floor.  When Plaintiff opened a door leading to the outdoor recreation area in order to

squeegee the water out of the building, Inmate Norwood, waiting outside the door, unexpectedly attacked Plaintiff by stabbing and cutting him with a weapon.  Defendant Castro did not physically interject himself between Inmate Norwood and Plaintiff, and the altercation between the two inmates did not end until another correctional officer from the F-1 dormitory joined Defendant at the scene.

### A.    Plaintiff's Version of Events

Plaintiff was assigned on May 6, 2016, as an orderly in the F-2, administrative segregation dormitory where misbehaving inmates are located, and his general duties included cleaning up showers and floors.  (Pl. Dep., doc. no. 71-2, pp. 44, 46.)  Inmates in F-2 could not get out of their cells and move around at will, but they were given designated recreation time in pens outside the dorm.  (Id. at 45.)  Two officers were assigned to F-2:  Floor Officer Newberry (Ofc. Newberry) and Defendant, who was there to assist with the showers and watch inmates. (Id. at 49-50.)  Plaintiff states in his "Declaration, or Affidavit of the Plaintiff," that to the best of his knowledge, Defendant was "a special trained officer, trained in hand to hand combat and disarming inmates with a weapon."  (Pl. Aff., doc. no. 79-8, p. 2.)  There was also an officer in the Control Room, Jones.  (Pl. Dep., p. 50.)  Ofc. Newberry and Defendant worked in tandem to escort one inmate to the shower and the other back to his cell.  (Id. at 52.)

 While Plaintiff was performing his orderly duties, he saw Ofc. Newberry and Defendant run the showers and take inmates to the outside recreation yard.  (Id. at 53-54.)  Eventually, Ofc. Newberry left Defendant to run the showers by himself when Ofc. Newberry went to the central station for lunch.  (Id. at 53, 59.)  Plaintiff was buffing the floor when he saw water running

down from the second floor to the first while Defendant was by himself running the shower, so Plaintiff went to ask Ofc. Newberry at the central station to come back and open the back door so Plaintiff could push the water out.  (Id. at 59.)  Ofc. Newberry acknowledged Plaintiff's request, but stayed in the central station.  (Id. at 59, 62.)  While standing by the showers, at the opposite end of the dorm from the back door, waiting for an inmate to finish, Defendant told Plaintiff to go to the back door, and Defendant would tell the control room officer to open it.  (Id. at 63, 67-69, 71 & Dep. Ex. 7.)  Plaintiff told Defendant he had to open the door, but Defendant told Plaintiff to push the door open.  (Id. at 63, 67.)  The door initially would not open, so Defendant told Plaintiff to push again.  (Id. at 68.)  When the door opened, Inmate Norwood attacked Plaintiff with a knife.  (Id. at 68, 71.)

Defendant was standing at the showers when Inmate Norwood attacked Plaintiff in the doorway from the recreation yard to the dorm.  (Id. at 72.)  Facing his attacker, Plaintiff "was just fighting him off.  He hitting and [Plaintiff was] fighting the knife off on this side because he . . . . everything is on this side because [Plaintiff] would not turn.  [Plaintiff] turned, fighting him off . . . ."  (Id. at 73.)  Defendant ran toward Plaintiff with his "taser and stuff," and Plaintiff said to Defendant, "Help me, man."  (Id. at 74.)  However, when Defendant got within fifteen feet of the altercation, he "dropped the radio and turned and ran back and left [Plaintiff]."  (Id. at 75.)  Defendant had a Taser and pepper spray with him.  (Pl. Aff., p. 2.)

Plaintiff "went back to trying to fight" and does not know how much time passed before Defendant came back with another officer.  (Id. at 76.)  Plaintiff does not know exactly how much time passed during the attack but estimates the time Defendant was gone at "a little while," maybe five minutes, but not ten minutes, before he came back with another officer.  (Id. at 76,

77.)  Plaintiff does not know where Defendant went when he left, but in the interim Plaintiff managed to break away from Inmate Norwood, who was "holding [Plaintiff] while he was stabbing [him]."  (Id. at 78.)  Plaintiff initially could not get away because Inmate Norwood was holding Plaintiff by the shirt collar and hitting him with the other hand.  (Id.  at 78-79.)

After Plaintiff broke free of Inmate Norwood's hold on his shirt collar, he fell to one knee.  (Id.)  As Plaintiff got back up, Defendant and another officer returned, and Defendant put out his Taser and told Inmate Norwood to drop his weapon, which he did.  (Id. at 79-80.)  As a result of the attack, Plaintiff sustained a bruised knee and cuts to his head, behind his ear, over his eye, and on his arm.  (Id. at 90.)  After receiving stiches and staples for his cuts, Plaintiff's wounds healed within approximately six to eight weeks.  (Id. at 93.)

**B.      Defendant's Version of Events**

Defendant was employed as a correctional officer assigned to work as a member of the TSP CERT Team on May 6, 2016.  (Def. Decl. I, doc. no. 71-3, ¶ 2.)  That day, he carried a Taser and O.C. spray with him on duty.  (Id., ¶ 7; Def. Decl. II, doc. no. 87-1, ¶ 7.)  As a correctional officer, Defendant received training prior to May 6th on how to respond to inmate-on-inmate physical altercations, to include use of force, use of a Taser, and use of O.C. spray.  (Def. Decl. I, ¶ 4; Def. Decl. II, ¶ 6.)  Regardless of whether the physical altercation began as a fight or unprovoked attack by one inmate against another, Defendant had been instructed to always have a backup officer present before attempting physical intervention and to never attempt to break up or interject himself between fighting inmates without the presence of a backup officer.  (Def. Decl. I, ¶ 4; Def. Decl. II, ¶ 5.)  No inmates, including Plaintiff, were

present during his training.  (Def. Dec. II, ¶ 6.)  Inmates have not been permitted, since at least August 2014, to be present or observe officer training on security protocols, including use of force, use of a Taser, use of O.C. spray, or responding to inmate-on-inmate physical altercations, because of the serious risk such observation would pose for prison security, as well as for the safety of inmates and staff.  (Williams Decl., doc. no. 87-2, ¶¶ 3-4.)

During his training, Defendant learned several reasons for the policy not to attempt to break up a physical altercation between inmates without a backup officer present:  (1) the altercation might be a ploy to lure an officer into the fray; (2) the inmates might quit fighting each other and turn the altercation into a two-on-one attack on a lone officer; and (3) the inmates might overpower or incapacitate on an officer, disarm the officer, or take the officer's keys, resulting in exposing the officer to further attack, an unguarded dorm, inmate access to keys that could unlock cell doors, and exposing other inmates to potential armed attackers.  (Def. Decl. I, ¶¶ 6, 8.)

As a CERT Team member, Defendant was not usually assigned to a particular dorm, but went to different dorms as needed throughout his shift.  (Def. Decl. I, ¶ 3.)  On May 6, 2016, Defendant was assisting the F-2 floor officer escorting inmates to the shower.  (Id. ¶ 10.)  The F building typically had three officers:  one in the centrally-located control room that had a view into each of the two dorms, one floor officer in the F-1 dorm, and one floor officer in the F-2 dorm.  (Id.)  While assisting with inmate showers, Plaintiff, who was working as an orderly, asked Defendant to have the back door of the dorm opened so that he could squeegee some water off the floor to the outside recreation area adjacent to the F-2 dorm.  (Id. ¶¶ 10-11.)  Defendant radioed the control room officer to unlock the door, not realizing another inmate was waiting

8

outside the door.  (Id. ¶¶ 12-13.)  When Plaintiff pushed the door open, the inmate attacked

Plaintiff by cutting or stabbing him with a homemade weapon.  (Id. ¶ 13.)

As soon as Defendant saw the fight, he gave verbal commands for the inmates to stop,

and when they did not, Defendant ran toward the fight as he attempted to call for backup on his

radio.  (Id. ¶ 14.)  Defendant inadvertently dropped his radio and briefly paused because he knew

he was supposed to call for backup before attempting to stop the fight.  (Id.)  However,

Defendant decided to leave the radio on the ground and continued running toward the two

inmates.  (Id.)  When Defendant got close to the two inmates, he drew his Taser and gave

additional verbal commands to quit fighting and lie on the ground.  (Id.)  Plaintiff and his

attacker complied without Defendant having to fire his Taser, and backup officers arrived shortly

thereafter.  (Id.)  Defendant estimates thirty to sixty seconds passed between the time the attack

began when Plaintiff opened the door to the outside recreation area and the fight ended.  (Id.

¶ 15.)

Even though he carried a Taser, Defendant's training taught him he should seek backup

before attempting to break up an inmate-on-inmate fight.  (Id. ¶ 8.)  In particular, Defendant had

been trained it is often not appropriate to fire a Taser at fighting inmates who are moving in close

proximity to each other because of the risk of accidentally striking and incapacitating the victim

rather than the aggressor, resulting in further harm to a victim who would no longer be able to

defend himself.  (Id. ¶¶ 8, 9.)  Similarly, based on his training and experience as a correctional

officer, Defendant did not believe it appropriate to use the O.C. spray he had with him when

Inmate Norwood attacked Plaintiff because the spray did not deploy a single stream of liquid, but

rather was a "vapor spray" or "fogger" that sprayed a wide cloud of O.C. mist that could cover a wide area, linger, and affect anyone in the area.  (Def. Decl. II, ¶ 8.)  Thus, Defendant could not spray only Inmate Norwood, and he risked incapacitating both Plaintiff and himself.  (Id.)

Moreover, Defendant knew from training:  (1) inmates previously exposed to O.C. spray, often housed in "lock-down" units like the F-2 dorm where the May 6th incident occurred, build up a tolerance to the spray, and (2) O.C. spray simply does not affect some people.   (Id.) Knowing all of these factors, Defendant determined there was an unacceptable risk if he used his O.C. spray, both he and Plaintiff might be left defenseless to Inmate Norwood.  (Id.)

### C.    Scope of Undisputed Facts

Plaintiff's response to Defendant's Statement of Undisputed Material Facts admits as "True Facts" all but fifteen of the fifty-five paragraphs.  (Compare doc. no. 71-1 with doc. no. 78, pp. 4-18.)  Therefore, all of Defendant's fact statements not directly opposed by Plaintiff and supported by the evidentiary record are deemed admitted.  See Loc. R. 56.1; Fed. R. Civ. P. 56(e); see also Scoggins v. Arrow Trucking Co., 92 F.Supp.2d 1372, 1373 n.1 (S.D. Ga. 2000) ("[A]ll unopposed fact statements supported by the evidentiary materials of record are deemed admitted).

Plaintiff submitted a "Declaration, or Affidavit" in opposition to Defendant's motion. (Doc. no. 79-8.)  Plaintiff opened his affidavit by declaring under penalty of perjury that his statement is "true and accurate to the best of my knowledge of the actions and non-actions" of Defendant.  (Id. at 1.)  However, an affidavit or declaration used to oppose a summary judgment motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the

10

matters stated." Fed. R. Civ. P. 56(c)(1) & (4).  Plaintiff's affidavit, "true and accurate to the best of [his] knowledge," cannot raise genuine issues of fact sufficient to defeat summary judgment because the statements are not based only on personal knowledge.  See Pace v. Capobianco, 283 F.3d 1275, 1278 (11th Cir. 2002); Stewart v. Booker T. Washington Ins., 232 F.3d 844, 851 (11th Cir. 2000) (self-serving allegation based "upon information and belief" insufficient to carry burden at summary judgment).

Moreover, as explained above, for purposes of summary judgment only, Defendant adopts - but still disputes - Plaintiff's version of events to argue he is entitled to summary judgment *even if* the Court were to accept Plaintiff's version of the facts.  As acknowledged by Defendant, his "conduct, from the point at which he dropped his radio until the point at which he drew his Taser and gave verbal commands to end the fight, is disputed by the Parties."  (Doc. no. 71-1, p. 1 & n.1)  Indeed, Plaintiff maintains Defendant ran toward the attack and then ran away, leaving Plaintiff by himself to fight off Inmate Norwood.  (Pl. Dep., pp. 74, 76.)  Defendant maintains he ran toward the attack as soon as he saw it underway, gave multiple verbal commands to stop fighting, and stayed at the scene until backup arrived.  (Def. Decl. I, ¶ 14; Stm. of Mater. Facts, doc. no. 71-1, ¶ 29.)  Notably, when responding to Defendant's Statement of Material Facts, Plaintiff contests calling the interaction with Inmate Norwood anything other than an attack, but he does not contest the statement that Defendant gave multiple verbal commands to stop fighting as soon as he saw the fight/attack.  (Doc. no. 78, p. 5, ¶ 29.)  Thus, for the purpose of deciding the summary judgment motion, the Court deems admitted that Defendant gave verbal commands to stop

the fight as soon as he saw Inmate Norwood attack Plaintiff is deemed admitted.  See Scoggins, 92 F.Supp.2d at 1373 n.1; Loc. R. 56.1

It is well-settled, "the 'facts,' as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case."  Williams v. Davis, 451 F.3d 759, 763 (11th Cir. 2006).  "That is, courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party and "when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's *version*."  (Id. (citation omitted).)

## III.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."  McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1244 (11th Cir. 2003) (citation omitted).

If the burden of proof at trial rests with the movant, to prevail at the summary judgment stage, the movant must show that, "on all the essential elements of its case . . . , no reasonable jury could find for the nonmoving party."  United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) (*en banc*).  On the other hand, if the non-moving party has the burden of proof at trial, the movant may prevail at the summary judgment stage either by negating an essential element of the non-moving party's claim or by pointing to specific portions of the record that demonstrate the non-moving party's inability to meet its burden of proof at trial.  Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991)

(explaining <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970) and <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986)).

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." <u>Id.</u> at 608.  The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981).  Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986) (quoting <u>Adickes</u>, 398 U.S. at 158-59).  A genuine dispute as to a material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> at 248.

## B.   Defendant's Response to the Attack Did Not Violate a Constitutional Right, and Even If It Did, the Right Was Not Clearly Established

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)); <u>Townsend v. Jefferson Cty.</u>, 601 F.3d 1152, 1157 (11th Cir. 2010).  A defendant carries the initial burden of showing that the contested actions fall within his discretionary authority, then the burden shifts to the plaintiff to show (1) violation of a constitutional right; and (2) the right violated was clearly established at the time. <u>Gilmore v. Hodges</u>, 738 F.3d

266, 272 (11th Cir. 2013) (citing Pearson, 555 U.S. at 232).  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects all but the plainly incompetent or those who knowingly violate the law."  Stanton v. Sims, 571 U.S. 3, 6 (2013) (per curiam) (citations omitted).

Here, the Court concludes, as it did in ruling on the prior motion to dismiss (doc. no. 46), that Defendant was acting within the scope of his discretionary authority because it is undisputed he was on duty as a CERT Team officer at TSP when Inmate Norwood attacked Plaintiff.  Nor do the parties dispute this point.  Thus, the burden shifts to Plaintiff to show the violation of a constitutional right.  See Gilmore, 738 F.3d at 272.

### 1.     Defendant Did Not Violate Plaintiff's Eighth Amendment Rights

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  Farmer v. Brennan, 511 U.S. 825, 828 (1994) (citations omitted).  "Although 'prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners,' not every instance of inmate on inmate violence 'translates into constitutional liability for prison officials responsible for the victim's safety.'"  Terry v. Bailey, 376 F. App'x 894, 895 (11th Cir. 2010) (per curiam) (citing Farmer, 511 U.S. at 833-34); see also Purcell ex rel. Estate of Morgan v. Toombs Cty., Ga., 400 F.3d 1313, 1323 (11th Cir. 2005) (recognizing that because "a risk of harm to some degree always exists by the nature of its being a [prison]," not every condition rises to the level of an Eighth Amendment violation); Gullatte v. Potts, 654 F.2d 1007, 1012 (5th Cir. Unit B Aug. 1981) ("This does not mean that the constitutional rights of inmates are violated every time a prisoner is injured.  It would not be reasonable to impose such an absolute and

clearly unworkable responsibility on prison officials."). Merely negligent failure to protect an inmate from attack does not justify liability under § 1983. <u>Brown v. Hughes</u>, 894 F.2d 1533, 1537 (11th Cir. 1990). Stated otherwise, a prison official may be held liable "if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." <u>Farmer</u>, 511 U.S. at 847.

To survive summary judgment, a plaintiff must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendant['s] deliberate indifference to that risk; and (3) causation." <u>Goodman v. Kimbrough</u>, 718 F.3d 1325, 1331 (11th Cir. 2013) (quoting <u>Carter v. Galloway</u>, 352 F.3d 1346, 1349 (11th Cir. 2003)). These three elements are evaluated in part by an objective standard and in part by a subjective standard. <u>See</u> <u>Caldwell v. Warden, FCI Talladega</u>, 748 F.3d 1090, 1099 (11th Cir. 2014).

As the Eleventh Circuit explained,

When examining the first element—a substantial risk of serious harm—the court uses an objective standard. The second element—the defendant's deliberate indifference to that risk—has two components: one subjective and one objective. To satisfy the subjective component, a plaintiff must produce evidence that the defendant actually (subjectively) kn[ew] that an inmate [faced] a substantial risk of serious harm. To satisfy the objective component, a plaintiff must produce evidence that the defendant disregard[ed] that known risk by failing to respond to it in an (objectively) reasonable manner.

<u>Id.</u> (internal citations and quotations omitted). The deliberate indifference prong of the test, at issue here, requires proof of "(1) subjective knowledge of a risk of serious harm; and (2)

disregard of that risk (3) by conduct that is more than mere negligence."[1]  Dang ex rel. Dang
v. Sheriff, Seminole Cty., Fla., 871 F.3d 1272, 1280 (11th Cir. 2017) (citation omitted).

In the context of a failure to intervene claim, a prison official can be liable under the
Eighth Amendment for failing to take reasonable steps to protect a victim from an ongoing
assault by another inmate.  See Ledlow v. Givens, 500 F. App'x 910, 914 (11th Cir. 2012)
(per curiam) (citing Skritch v. Thornton, 280 F.3d 1295, 1301 (11th Cir. 2002)).   As
explained by the Eleventh Circuit, liability for a failure to intervene claim may be imposed
when:  (1) another inmate's physical assault created a substantial, objective risk of injury, (2)
of which a defendant is subjectively aware, (3) the defendant was in a position to intervene,
and (4) the defendant did not respond reasonably to the risk of injury.  See Johnson v. Boyd,
568 F. App'x 719, 724-25 (11th Cir. 2014) (per curiam).   Plaintiff bears the burden of
showing Defendant was in a position to intervene but did not do so.  See Ledlow, 500 F.
App'x at 914.

The reasonable response requirement has been described as follows:

> "[P]rison officials who actually knew of a substantial risk to inmate
> health or safety may be found free from liability if they responded reasonably
> to the risk, even if the harm ultimately was not averted."  Farmer, 511 U.S. at
> 844.  More succinctly, "prison officials who act reasonably cannot be found
> liable under the Cruel and Unusual Punishments Clause."  Id. at 845.  We have
> said that a prison official violates the Eighth Amendment if he responds to a
> known risk "in an objectively unreasonable manner."  Cottone [v. Jenne], 326
> F.3d 1352, 1358 (11th Cir. 2003).  An official responds to a known risk in an
> objectively unreasonable manner if "he knew of ways to reduce the harm but
> knowingly declined to act" or if "he knew of ways to reduce the harm but

---

[1] The Court rejects Defendant's reliance on a standard of "gross negligence" for the
reasons explained by the Eleventh Circuit in Melton v. Abston, 841 F.3d 1207, 1223 n.2 (11th
Cir. 2016).   In any event, Defendant is entitled to summary judgment using the "mere
negligence" standard.

recklessly declined to act."  Hale [v. Tallapoosa Cty.,] 50 F.3d 1579, 1583 (11th Cir. 1995).

Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 619-20 (11th Cir. 2007) As noted, for liability to attach, prison officials must have been "in a position to intervene." Terry, 376 F. App'x at 896 (citing Ensley v. Soper, 142 F.3d 1402, 1407 (11th Cir. 1998)).  An officer who fails to intervene in a fight between inmates can only be held liable if he "was physically able and had a realistic chance to intervene and act in time to protect the inmate plaintiff."  Smith v. Andrews, CV 114-206, 2016 WL 6818755, at *4 (S.D. Ga. Nov. 16, 2016) (collecting cases), *adopted by*, 2016 WL 7197446 (S.D. Ga. Dec. 9, 2016) (Hall, C.J.). Seals v. Marcus, No. 1:11-CV-99 WLS, 2013 WL 656873, at *7 (M.D. Ga. Jan. 25, 2013) (same), *adopted by*, 2013 WL 663579 (M.D. Ga. Feb. 22, 2013).

As the Eleventh Circuit has explained, "Regardless of the presence or absence of a weapon in the hands of the attacking inmates, 'no rule of constitutional law requires unarmed officials to endanger their own safety in order to protect a prison inmate threatened with physical violence.'"  Seals v. Marcus, No. 1:11-CV-99 WLS, 2013 WL 656873, at *8 (M.D. Ga. Jan. 25, 2013) (quoting Longoria v. Texas, 473 F.3d 586, 594 (5th Cir. 2006)), *adopted by*, 2013 WL 663579 (M.D. Ga. Feb. 22, 2013); see also Prosser v. Ross, 70 F.3d 1005, 1008 (8th Cir. 1995) ("[P]rison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm."); Winfield v. Bass, 106 F.3d 525, 532 (4th Cir. 1997) ("[A]ll of the authority of which we are aware leads to the conclusion that such heroic measures are not constitutionally required.").

17

Here, there can be no doubt Inmate Norwood's attack created a substantial, objective risk of injury of which Defendant was subjectively aware.  Indeed, he ran toward the fight when he saw it.  Thus, the question becomes whether Defendant was in a position to intervene and whether he responded reasonably.  See Rodriguez, 508 F.3d at 619-20; Terry, 376 F. App'x at 896.  The undisputed facts show Defendant did not act with deliberate indifference to Plaintiff's safety because as the temporarily-assigned, sole officer in the F-2 dorm when the attack started, he was not in a position to intervene in an inmate-on-inmate altercation involving use of a weapon until backup arrived, consistent with his training and prison policy.  He acted reasonably in issuing verbal commands to stop fighting and bringing the fight to a rapid conclusion.

When the altercation started, Defendant was at the end of the dorm opposite the door to the recreation area through which Inmate Norwood launched his surprise attack and began stabbing Plaintiff while holding him by the shirt collar.  (Pl. Dep., pp. 68-69, 71, 78-79 & Ex. 7.)  Defendant ran to within fifteen feet of the two inmates while attempting to use his radio to call for backup, but he dropped the radio.  (Pl. Dep., pp. 75-76.)  Although Defendant gave verbal commands for the inmates to stop fighting, rather than deploying his Taser or O.C. spray, Defendant turned around and ran away when he dropped his radio, leaving Plaintiff to fight off Inmate Norwood by himself.  (Pl. Dep., pp. 76-77; Def. Decl., ¶ 14.)   However, Defendant returned with a backup officer, drew his Taser, and ordered the inmates to the ground, at which time the incident ended.  (Pl. Dep., p. 78; Def. Decl. ¶ 15.)

Defendant's response was consistent with his training not to intervene without a backup officer, so as to avoid known risks such as leaving himself vulnerable to a potential two-on-one

attack, which in turn could result in an unguarded dorm, inmate access to keys to unlock cell doors, and exposing more inmates to armed attack.  (Def. Decl. I, ¶ 6; Def. Decl. II, ¶ 4, 7.) Without backup, firing the Taser was not a viable option:  the inmates were moving around in close proximity to each other because Inmate Norwood had grabbed Plaintiff's shirt collar to prevent him from getting away, and the Taser could have hit Plaintiff rather than Inmate Norwood.  (Pl. Dep., pp. 78-79; Def. Decl. I, ¶ 9.)  Likewise, the O.C. spray, in its fogger form rather than a directed spray, threatened to incapacitate Plaintiff and Defendant while possibly not having any effect on Inmate Norwood.  (Def. Decl. II, ¶ 8.)  Faced with no viable options for immediately physically interjecting himself to stop the fight because of a lack of backup, and having inadvertently dropped his radio, consistent with his training, Defendant reasonably responded by issuing verbal commands to stop fighting, seeking backup, and stopping the attack within thirty to sixty seconds of when it began.  (Def. Decl. I, ¶¶ 5-6, 14-15.)

Plaintiff strenuously argues Defendant had training in self-defense and hand-to-hand combat, which made it unreasonable for him to leave Plaintiff to fend for himself while Defendant sought backup.  However, Plaintiff has placed no evidence in the record to support his conclusory allegations about specialized training.  Plaintiff's affidavit, accurate to the best of his knowledge, in which he claims Defendant was trained in hand to hand combat and disarming inmates with a weapon, (Pl. Aff., p. 2), is not sufficient to carry his burden.  See Pace, 283 F.3d at 1278; Stewart, 232 F.3d at 851.  In any event, standard prison policy required Defendant to obtain backup before intervening in an inmate-on-inmate fight.  (Def. Decl. I, ¶¶ 5, 8; Def. Decl. II, ¶ 7.)

Plaintiff also maintains Defendant was gone for longer than thirty to sixty seconds, arguing Defendant's lengthy absence to obtain backup was unreasonable.  However, at his deposition, Plaintiff admitted he did not know, beyond "a little while," how long Defendant was gone.  (Pl. Dep., pp. 76-77.)  Plaintiff guessed at five minutes, but "not even" ten minutes.  (Id. at 77.)  Plaintiff's affidavit states Defendant was gone "a good while," (Pl. Aff., p. 2), and a subsequent opposition filing states the whole incident lasted fifteen to twenty minutes.  (Doc. no. 88, p. 5.)  Plaintiff has no explanation for his changing time estimates.

Plaintiff cannot defeat summary judgment by backtracking on his deposition concession that he did not know how long the incident lasted.  When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of mater fact [for summary judgment], that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." Van T. Junkins and Assoc., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984); see also Bryant v. U.S. Steel Corp., 428 F. App'x 895, 896 (11th Cir. 2011) (per curiam) (affirming district court's disregard of affidavit submitted to avoid summary judgment that "squarely contradicted unequivocal testimony [the plaintiff] gave on deposition").  To the extent Plaintiff attempts to avoid summary judgment by crafting an unsubstantiated argument Defendant took an unreasonably long time to return with backup, his argument fails.

In any event, Plaintiff acknowledges he does not know what happened when Defendant dropped his radio.  (Pl. Dep., p. 76.)  Stated otherwise, this is not a case where a prison guard stood idly by for five minutes without taking any action while one inmate

20

assaulted another.  Cf. Woodyard v. Ala. Dep't of Corr., 700 F. App'x 927, 934 (11th Cir.

2017) (*per curiam*) (reversing summary judgment for a prison guard based on disputed fact

whether guard immediately called for help or delayed seeking assistance for five minutes).

Plaintiff has not established Defendant merely watched the fight without doing anything for

*any* amount of time without seeking help.  Rather, the crux of Plaintiff's argument is that

Defendant should have *immediately* jumped into the fray without waiting for backup.  This,

Defendant was not required to do.  Id.  ("Though [the guard] was not required to leap into the

fray alone to save [the inmate] he could have called for assistance right away instead of

waiting five minutes to do so.")  There is no dispute Defendant ran toward the fight, issued

verbal warnings to stop, and sought backup without delay.

In sum, the Court recognizes Plaintiff was unfortunately injured through no fault of

his own.  However, as a lone officer faced with an armed attacker carrying only a Taser and

an O.C. spray fogger that might incapacitate Plaintiff and/or himself rather than Inmate

Norwood, Defendant was not in a position to intervene without backup and took reasonable

steps to abate the risk facing Plaintiff.  See Farmer, 511 U.S. at 847.  No reasonable juror

would find to the contrary.  Defendant immediately gave verbal commands to stop fighting,

sought backup, and brought the altercation to a rapid conclusion, keeping in mind prison

policy requiring backup for officer and inmate safety before attempting to physically

intervene in an inmate-on-inmate fight.  At most, dropping the radio may have been

negligence, but negligence is not sufficient to show a constitutional violation.  Brown, 894

F.2d at 1537.

2.   **Even if the Court Were to Assume an Eighth Amendment Violation Occurred, Plaintiff Cannot Show Defendant's Conduct Violated a Clearly Established Constitutional Right**

Even if Defendant did violate Plaintiff's Eighth Amendment rights, which he did not, Defendant is entitled to qualified immunity because those rights were not clearly established at the time of the alleged violation.  "A right is clearly established if, in light of already-existing law, the unlawfulness of the conduct is apparent, and if a constitutional rule applies with obvious clarity to give an official fair warning that violating that right is actionable." Bennett v. Hendrix, 423 F.3d 1247, 1255 (11th Cir. 2005) (internal citations omitted).  "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  Saucier v. Katz, 533 U.S. 194, 202 (2001).  "A constitutional violation may be clearly established either by similar prior precedent, or in rare cases, 'obvious clarity.'"  Gilmore, 738 F.3d at 277.  The similar prior precedent must come from the United States Supreme Court, the Eleventh Circuit, or the highest court in the state where the events occurred.  Terrell v. Smith, 668 F.3d 1244, 1255-56 (11th Cir. 2012).

The Supreme Court recently re-emphasized the clearly established right must be defined with specificity.  Escondido v. Emmons, -S. Ct.-, No. 17-1660, 2019 WL 113027, at *2 (U.S. Jan. 7, 2019). "This Court has repeatedly told courts . . . not to define clearly established law at a high level of generality."  Id. (citation omitted).  "A judicial precedent with materially identical facts is not essential for the law to be clearly established, but the preexisting law must make it obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue." Youmans v. Gagnon, 626 F.3d 557, 563 (11th

Cir. 2010) (footnote and citation omitted).  "More than a general legal proposition - for example, to act reasonably - is usually required; if a plaintiff relies on a general rule, it must be obvious that the general rule applies to the specific situation in question."  Id. (citation omitted).

In May 2016, it was clearly established that prison officials have a duty to afford inmates reasonable protection from a known danger, including violence by other inmates.  See Farmer, 511 U.S. at 832-33 ("[O]fficials . . . must 'take reasonable measures to guarantee the safety of the inmates,'  . . .  In particular, as the lower courts have uniformly held, and as we have assumed, 'prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.'"); Rodriguez, 508 F.3d at 620 ("[A] prison official violates the Eighth Amendment if he responds to a known risk 'in an objectively unreasonable manner' . . . [i.e.,] if 'he knew of ways to reduce the harm but knowingly declined to act' or if 'he knew of ways to reduce the harm but recklessly declined to act.'"); Hopkins v. Britton, 742 F.2d 1308, 1310 (11th Cir. 1984) ("[W]hen prison officials are or should be aware of a danger posed to an inmate, they are obligated to take all reasonable steps to protect him, and the failure to do so may be an actionable constitutional wrong." (citation omitted).)

However, the issue here is not the general proposition that prison officials must provide reasonable protection from violence by other inmates.  Rather, as emphasized by the Supreme Court, the clearly established right must be defined with specificity.  Escondido, 2019 WL 113027, at *2.  The issue here is whether on May 6, 2016, the state of the law gave Defendant fair warning that a correctional officer armed with a Taser and O.C. spray and

23

outnumbered by two inmates, one of whom has a weapon, was deliberately indifferent where the officer (a) gave verbal commands to stop fighting, and (b) immediately sought backup to promptly end the altercation.

To defeat Defendant's assertion of qualified immunity, Plaintiff must show his "supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances." Long v. Slaton, 508 F.3d 576, 584 (11th Cir. 2007) (citation omitted).  However, Plaintiff has not identified, and the Court is not aware of, any controlling and materially similar case law that Defendant's response to Inmate Norwood's attack was "clearly unlawful given the circumstances."  Rather, Plaintiff has instead relied on cases for the general proposition that the Eighth Amendment imposes a general duty of protection, but a general legal proposition to act reasonably is not sufficient.  See Youmans, 626 F.3d at 563.

Plaintiff's citations to general case law about prisoner suicide, exposure to repeated prison violence, delaying medical care to an unconscious prisoner, and failing to protect a known child molester from fellow inmates are inapposite and cannot satisfy the specificity requirement.  (Doc. no. 78, pp. 9-10; doc. no. 79, pp. 5-6; doc. no. 88, p. 8.)  For example, Plaintiff cites Matthews v. Crosby, 480 F.3d 1265 (11th Cir. 2007), (doc. no. 78, p. 10), but that involved a warden's ignoring a history of widespread inmate abuse at the hands of prison guards, not the actions of a lone correctional officer facing an unexpected fight between inmates, one of whom was armed.  Plaintiff also cites Edwards v. Prime, Inc., 602 F.3d 1276, 1291 (11th Cir. 2011), (doc. no. 78, p. 10), but that case was about employment

24

practices in a restaurant.  The cases cited by Plaintiff are too different from this case to make the law applicable to the circumstances encountered by Defendant clearly established on May 6, 2016.  See Youmans, 626 F.3d at 555.

Nor does Plaintiff's reliance on cases that allowed him to survive Defendant's assertion of qualified immunity at the earlier motion to dismiss stage suffice at the summary judgment stage.  (See doc. no. 46.)  Whereas facts at the motion to dismiss stage were not sufficiently developed to make a definitive determination about whether Defendant's actions were clearly unlawful, at the summary judgment stage, the Court now has a developed evidentiary record.  Plaintiff can no longer rely on general allegations and promises to produce evidence at trial as a way to suggest the facts of the case are not appropriate for the protections afforded by qualified immunity.  (See, e.g., doc. no. 78, pp. 16-17 (arguing a trial will "show and prove" facts of the case).)

Nor is this a case where Defendant's conduct "so obviously violates the constitution that prior case law is unnecessary.  Obvious clarity cases are 'rare,' and present a 'narrow exception' to the general rule of qualified immunity."  Gilmore, 738 F.3d at 279 (citations omitted).  Plaintiff's laundry list of Eighth Amendment cases across the spectrum of deliberate indifference are not sufficient to establish the law such that every objectively reasonable officer facing the circumstances faced by Defendant would know his conduct violated federal law.  See id.  Likewise, Plaintiff has not shown Defendant's conduct was "so bad that case law is not needed to establish that the conduct cannot be lawful."  Id.  As discussed in detail above, this Court has concluded based on the facts of the case that no

Eighth Amendment violation occurred.  Even if Defendant had been negligent in any aspect of his response, there is nothing so egregious about a lone officer, trained to always obtain backup, issuing verbal commands and seeking backup without delay before intervening in an inmate-on-inmate attack, where one inmate was armed.

Accordingly, because he is entitled to qualified immunity, Defendant is entitled to summary judgment on Plaintiff's claims.

## III.   CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** any motion for Rule 11 sanctions construed from "The Plaintiff Oppose the Defendant Motion for Summary Judgment Because Violation of the Federal Rule of Civil Procedure 11. Alleging New Defense in Bad Faith" be **DENIED**, (doc. no. 75), Defendant's motion for summary judgment be **GRANTED**, (doc. no. 71), a final judgment be entered in favor of Defendant, and this civil action be **CLOSED**.

SO REPORTED and RECOMMENDED this 17th day of January, 2019, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA